1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9
10

| | |
|---|---|
| JASON L. BARSNESS et al.,<br><br>          Plaintiffs,<br><br>   v.<br><br>UNITED STATES OF AMERICA et al.,<br><br>          Defendants. | CASE NO. 2:23-cv-00427-LK<br><br>ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EXPERT TESTIMONY AND DENYING MOTION FOR SUMMARY JUDGMENT |

11
12
13
14
15

16    This matter comes before the Court on the Government's Motions to Exclude Testimony

17  of Drs. Recht, Vogel, and Kaloostian, Dkt. No. 25,[1] and for Summary Judgment, Dkt. No. 27.

18  Plaintiffs oppose both motions. Dkt. Nos. 33, 34. For the reasons explained below, the motion to

19  exclude is granted in part and denied in part and the motion for summary judgment is denied.

20                                    **I.    BACKGROUND**

21         Jason Barsness is a 47-year-old Army veteran living in Lynnwood, Washington with his

22  wife and three children. Dkt. No. 26-1 at 3–6; Dkt. No. 35-30 at 2. In 2000, Barsness fell backwards

23

24  _____

[1] The Government also initially sought to exclude the testimony of Dr. Michael Shannon but later withdrew its request for Court review of Dr. Shannon's expert testimony. Dkt. No. 29.

and suffered a right scaphoid fracture (a type of wrist fracture). Dkt. No. 7 at 3; Dkt. No. 35-1 at 3. He reported on and off pain during the intervening years. Dkt. No. 35-1 at 3. In 2015, the pain worsened and Barsness received two steroid injections for wrist weakness. *Id.*

**A.    Barsness Establishes Care with VAPS in February 2018**

In February 2018, when he was 39 years old, Barsness established care with the VA Puget Sound ("VAPS") health care system. Dkt. No. 35-1. During his new patient workup, Barsness reported "worsening pain" in his right wrist that was "causing [his] arm to go numb[.]" *Id.* at 3. He also reported radiating pain to the back of his head, and that he would periodically lose his grip due to a "sharp shooting pain[.]" *Id.* He additionally described "having neck pain, lateral arm pain and sensitivity." *Id.* The attending physician referred Barsness for a wrist x-ray and to orthopedics for further evaluation. *Id.* at 4. The physician added that if there was persistent pain, she "would consider cervical cause and get EMG, maybe MRI[.]" *Id.*

**B.    Between March and October 2018, Barsness Undergoes Testing for His Right-Sided Symptoms**

1.    <u>VAPS Orthopedics Evaluates Barsness (March – May 2018)</u>

The VAPS orthopedics team saw Barsness three times between March and May 2018. Dkt. No. 26-3 at 2–4 (March 2018 assessment); 5–7 (April 2018 assessment); 8–9 (May 2018 assessment). During his March 2018 assessment, Barsness described "a sharp, shooting pain that radiates up his arm, all the way to his biceps, and occasionally associated with numbness just over the thenar pad but not into the digits." *Id.* at 3. An MRI of his right wrist showed "no obvious acute abnormalities." *Id.* at 6. Unable to explain the distribution of pain in his mid-arm, in May 2018, the orthopedics team referred Barsness to occupational therapy and rehabilitation medicine therapy focusing on spine care. *Id.* at 9.

2. <u>VAPS Rehabilitation Care Services Evaluates Barsness (June – July 2018)</u>

In June 2018, the VAPS Rehabilitation Care Services ("RCS") team saw Barsness for "diffuse right upper extremity radiating pain" and to rule out "spine cause." Dkt. No. 26-4 at 2. The RCS team noted likely right upper extremity guarding due to underlying carpal tunnel syndrome, and "doubt[ed] cervical origin." *Id.* at 6. They referred Barsness for a cervical spine x-ray and a right upper extremity EMG. *Id.*

During his July 2018 visit, the RCS team reviewed the results of the cervical spine x-ray and the EMG. Dkt. No. 26-5 at 4–6. The cervical spine x-ray showed no abnormalities. *Id.* at 5. The EMG showed evidence of carpal tunnel syndrome, but showed no evidence of right cervical motor radiculopathy and produced no findings that clearly explained his proximal right arm pain. *Id.* at 4–5. RCS then referred Barsness for a neurosurgery consult to consider a right wrist carpal tunnel decompression surgery. *Id.* at 6.

3. <u>VAPS Neurosurgery Evaluates Barsness (September – October 2018)</u>

In September 2018, Barsness consulted a physician assistant in a VAPS neurosurgery clinic, who assessed him as having carpal tunnel syndrome, but with atypical symptoms. Dkt. No. 26-6 at 4. The physician assistant referred Barsness to occupational therapy and told him to return in six weeks for re-evaluation by the attending neurosurgeon. *Id.* In October 2018, Barsness met with the attending neurosurgeon, who told him that the clinical picture did not fit carpal tunnel syndrome and that decompression surgery would not help with the pain. Dkt. No. 26-7 at 3. The neurosurgeon suggested that Barsness return to the orthopedics clinic to revisit the issue with a hand surgeon. *Id.* at 3–4.

4. <u>Barsness Is Told to Complete Occupational Therapy Before Returning to Orthopedics, and Does Not Follow Up Until 2020</u>

Later in October 2018, orthopedics reviewed Barsness's records and requested that he first

1    complete occupational therapy before returning. Dkt. No. 26-8 at 3. Barsness did not follow up

2    with VAPS until June 2020, Dkt. No. 26-1 at 18–22, though he did attend his annual primary care

3    appointment outside the VAPS system in late 2019, Dkt. No. 26-9.

4    **C.    Barsness Resumes Care with VAPS in 2020**

5        Barsness met with a VAPS primary care provider by video conference in June 2020 to

6    discuss his sleep apnea and to report continued pain and numbness in his right wrist and arm. Dkt.

7    No. 26-1 at 11; Dkt. No. 26-10 at 2. The attending physician referred him to orthopedics for further

8    evaluation and for possible carpal tunnel release surgery. Dkt. No. 26-1 at 12–13; Dkt. No. 26-10

9    at 3–4. Barsness received a referral to the wrong orthopedics specialty and was not evaluated by a

10   hand surgeon. Dkt. No. 26-11 at 2–3.

11   **D.    In October 2021, Additional EMG Testing Shows Cervical Radiculopathy**

12       In July 2021, at his next annual appointment, Barsness reported continued numbness in his

13   arm and wrist, which he described as constant. Dkt. No. 26-11 at 2. His thumb and pointer finger

14   were "pretty much numb all the time" and he was experiencing "stabbing pain" in his upper bicep

15   and shoulder. *Id.* The pain had radiated to his left shoulder as well, and he was "starting to

16   experience very sensitive to light touch on his cervical spine and upper chest" on the right side. *Id.*

17   The attending physician wrote that it was "curious his EMG did not exhibit cervical radiculopathy"

18   "[g]iven the distribution of his pain which certainly sounds neuropathic[.]" *Id.* at 3. The physician

19   noted that "it may be worthw[h]ile to re-evaluate with updated EMG." *Id.*

20       In October 2021, orthopedics reevaluated Barsness and ordered new EMG testing, which

21   showed cervical radiculopathy in the C5-6 level of his cervical spine. Dkt. No. 26-12 at 2–3.

22   Orthopedics then ordered a cervical spine MRI. *Id.* at 3.

23

24

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EXPERT TESTIMONY AND
DENYING MOTION FOR SUMMARY JUDGMENT - 4

**E.    In 2022, Barsness Has a Cervical Spine MRI Which Reveals a Tumor, and Undergoes Surgery to Remove It**

In February 2022, Barsness had a cervical spine MRI, which showed a cervical spinal cord intramedullary tumor. Dkt. No. 26-13 at 2. In March 2022, Dr. Ellenbogen, a neurosurgeon at the University of Washington (outside the VAPS system) discussed the MRI results with Barsness. Dkt. No. 26-14 at 2. He told Barsness that the results are "most consistent with an intramedullary ependymoma" and that he "will need an operation to remove this." *Id.* Dr. Ellenbogen discussed the risks associated with surgery, the post-surgery rehabilitation involved, and alternatives to surgery, which Barsness understood. *Id.* at 3. The goal of surgery was to have Barsness return to work. *Id.*

Later that month, Barsness underwent surgery. Dkt. No. 26-15. Pathology from the surgery diagnosed a grade two spinal ependymoma. Dkt. No. 26-16 at 3. After the surgery, Barsness managed to lift his arms and lengths "with 4/5 strength" and was able to move his hands and feet, but exhibited "some sensory loss on the right side." Dkt. No. 26-15 at 5.

**F.    Barsness Suffers Spinal Cord Injury from Surgery; Plaintiffs File Suit Alleging VAPS Failed to Timely Diagnose and Remove His Tumor**

Barsness continued to report symptoms after the surgery. A post-surgery MRI revealed that the surgery caused an atrophy of his spinal cord, assessed as a C4 spinal cord injury. Dkt. No. 35-33 at 2; Dkt. No. 35-34 at 6. His spinal cord injury is graded by the American Spinal Injury Association's impairment scale as "D" (incomplete tetraplegia), with "severe proprioceptive and sensory loss." Dkt. No. 7 at 6; Dkt. No. 27 at 7.

This lawsuit followed. Plaintiffs do not allege deficiencies with Dr. Ellenbogen's surgery and related treatment. They instead advance claims of medical negligence and breach of the duty of informed consent against the United States (by and through VAPS) for VAPS' alleged failures to timely order and perform a cervical spine MRI and perform surgical removal of the tumor,

resulting in permanent injury to Barsness. Dkt. No. 7 at 6–7, 9; *see also* Dkt. No. 7-2 at 6–8 (listing injuries).

**G.    Procedural History**

Plaintiffs are Jason Barsness, his wife, and their three children. Dkt. No. 7 at 1. They bring this suit under the Federal Tort Claims Act ("FTCA"). *Id.* at 6.

Before Plaintiffs filed this case, the Department of Veterans Affairs confirmed that the VAPS physicians and employees named in the complaint are covered by the FTCA, Dkt. No. 7-1 at 4, making the Government the only proper Defendant to this action. 28 U.S.C. § 2679. Plaintiffs also exhausted their administrative remedies before suing. In October 2022, pursuant to 28 U.S.C. § 2675, Plaintiffs each filed and presented an administrative claim for damages to the Department of Veterans Affairs. Dkt. No. 7-2 at 2, 12, 21, 29, 37. On March 7, 2023, Plaintiffs received notice that the Department of Veterans Affairs had denied their administrative claims. Dkt. No. 7-4 at 2.

On March 22, 2023, Plaintiffs commenced this action. Dkt. No. 1. They amended their complaint in May 2023, Dkt. Nos. 7–10, and the Government filed its answer in June 2023, Dkt. No. 14. The parties exchanged expert disclosures on or before March 29, 2024. Dkt. No. 22. Plaintiffs disclosed the testimony of (among others) Dr. Paul Kaloostian, Dr. Hannes Vogel, and Dr. Lawrence Recht. All three opine on causation, and the Government seeks to have those opinions excluded. Dkt. No. 25. The Government also moves for summary judgment based on Barsness's inability to prove causation. Dkt. No. 27.

## II.    DISCUSSION

**A.    Jurisdiction**

This Court has subject matter jurisdiction over this action because FTCA claims are exclusively within the jurisdiction of the federal district courts. *See* 28 U.S.C. § 1346(b).

Venue is proper in this Court because Plaintiffs resided in this judicial district at all material times and a substantial part of the events giving rise to the claims occurred in this judicial district. 28 U.S.C. § 1402(b); Dkt. No. 7 at 1-3.

The parties appear to agree that Plaintiffs exhausted all available administrative remedies before filing a suit in federal court. 28 U.S.C. § 2675(a); Dkt. No. 7 at 3; Dkt. No. 14 at 2–3.

**B.   The Government's Motion to Exclude Expert Testimony is Granted in Part and Denied in Part**

The Government moves to exclude the causation testimony of three of Plaintiffs' experts: Dr. Lawrence Recht (neurooncologist), Dr. Hannes Vogel (neuropathologist), and Dr. Paul Kaloostian (neurosurgeon). Dkt. No. 25 at 1. The Government argues that each opinion lacks a reliable foundation and methodology. *Id.* For the reasons discussed below, the Court grants the motion as to Dr. Recht, grants the motion in part as to Dr. Vogel, and denies the motion as to Dr. Kaloostian.

1.   Legal Standards

Under Rule 702, a trial court may exercise discretion to allow expert testimony if the proponent "demonstrates to the court that it is more likely than not that" such testimony (1) "will help the trier of fact to understand the evidence or to determine a fact in issue;" (2) "is based on sufficient facts or data;" (3) "is the product of reliable principles and methods;" and (4) "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d) (2023). The Court's role at this stage is that of "gatekeeper," and at the gatekeeping stage the relevant inquiry is limited to whether the expert's testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

"The relevancy bar is low," demanding only that the expert opinion "logically advances a

material aspect of the proposing party's case." *Messick v. Novartis Pharms. Corp.*, 747 F.3d 1193, 1196 (9th Cir. 2014). Expert opinion testimony is reliable if the knowledge underlying it "has a reliable basis in the knowledge and experience of the relevant discipline." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013) (citation omitted). The reliability inquiry "focuses not on what the experts say, or their qualifications, but what basis they have for saying it.'" *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (citation modified). The district court "may reject testimony that is wholly speculative" but should "not weigh the expert's conclusions or assume a factfinding role." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022).

The Ninth Circuit has explained that expert medical testimony should be admitted "if physicians would accept it as useful and reliable." *United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006). Medical testimony may be based mainly on the expert's experience and need not be conclusive. *Primiano v. Cook*, 598 F.3d 558, 565–66 (9th Cir. 2010). Where medical experts who "stand at or near the top of their field and have extensive clinical experience with the . . . class of disease at issue, are prepared to give expert opinions supporting causation . . . *Daubert* poses no bar based on their principles and methodology." *Wendell v. GlaxoSmithKline LLC*, 858 F.3d 1227, 1237 (9th Cir. 2017).

Still, "nothing in *Wendell* absolves expert witnesses of the general and longstanding requirement that they explain their methods with enough detail[.]" *In re Incretin-Based Therapies Prods. Liab. Litig.*, No. 21-55342, 2022 WL 898595, at *1 (9th Cir. Mar. 28, 2022). Indeed, "there is no presumption in favor of admission," *Engilis v. Monsanto Co.*, No. 23-4201, 2025 WL 2315898, at *6 (9th Cir. Aug. 12, 2025), and experts relying on their experience as a basis for their opinion must still explain "how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the

facts," *Avery v. City of Seattle*, No. 2:22-CV-00560-LK, 2024 WL 2959541, at *7 (W.D. Wash. June 12, 2024) (quoting Fed. R. Evid. 702, Advisory Committee's Notes to 2000 amendment). And although *Daubert* "may be harder to apply when the expert testimony is 'experience-based' rather than 'science-based,'" any such difficulty "cannot simply lead to a 'that goes to weight, not admissibility' default"; rather, there is "a strong argument that reliability becomes more, not less, important when the 'experience-based' expert opinion is perhaps not subject to routine testing, error rate, or peer review type analysis, like science-based expert testimony." *United States v. Valencia-Lopez*, 971 F.3d 891, 898 (9th Cir. 2020); *see also* Fed. R. Evid. 702, Advisory Committee's Notes to 2023 amendment (decisions holding "that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility . . . are an incorrect application of Rules 702 and 104(a)").

## 2.  Dr. Recht's Opinion is Excluded

Dr. Recht opines that, to a reasonable degree of medical probability, (1) a cervical spine MRI conducted in 2018 "would have found a significantly smaller tumor" and a "smaller or absent" syrinx, and (2) the smaller tumor and syrinx "would have been removable" in 2018 "without permanent paralytic injury" to Barsness.[2] Dkt. No. 26-19 at 4–5, 7–8. The Government seeks to exclude both opinions because they are not "based on sufficient facts or data" or "the product of a reliable methodology." Dkt. No. 25 at 6.

### (a) Dr. Recht's opinion is relevant

The Government does not dispute that Dr. Recht's opinion is relevant. *See generally* Dkt. No. 25 at 6–8; Dkt. No. 36 at 4–6. The Court finds that his opinion easily clears *Daubert*'s

---

[2] The syrinx is a fluid-filled cyst found below the tumor and extending into the spinal cord. Dkt. No. 26-13 at 2. During his deposition, Dr. Recht clarified that his opinion considers the tumor and syrinx together. Dkt. No. 26-21 at 9. Therefore, the Court will do the same; when it refers to the tumor's growth and resection, it intends to refer to both the tumor and syrinx unless stated otherwise.

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EXPERT TESTIMONY AND DENYING MOTION FOR SUMMARY JUDGMENT - 9

relevance bar. As discussed below in the Court's opinion on the Government's motion for summary judgment, Washington law requires that causation in medical negligence cases be proved by expert testimony. Thus, Dr. Recht's causation opinion certainly "advances a material aspect" of Plaintiffs' case. *Messick*, 747 F.3d at 1196.

### (b) Dr. Recht is qualified to provide his opinion

Dr. Recht is also qualified to opine on spinal tumors. He is Chief of the Adult Neuro-Oncology Department at Stanford University. Dkt. No. 26-19 at 3. His clinical duties include "taking care of patients with brain and spinal cord tumors" and he has "personal experience in treating patients like Mr. Barsness with a spinal ependymoma[.]" *Id.* However, he is not a surgeon and has never performed or assisted with one. Dkt. No. 35-36 at 8.

### (c) Dr. Recht's opinion is not reliable

The Government first challenges the reliability of Dr. Recht's opinion. As an initial matter, both parties appear to agree that the opinion is significantly based on his clinical training and experience. Dkt. No. 33 at 11; Dkt. No. 36 at 5; *see also* Dkt. No. 26-19 at 4–5 (Dr. Recht's report, describing his opinion as "based on his education, training, and experience"). As described above, a medical expert may rely heavily on their experience, *Wendell*, 858 F.3d at 1237, but they must still explain their methods, *In re Incretin-Based Therapies*, 2022 WL 898595, at *1. Put differently, the opinion must describe a "methodology [that] can be challenged in some objective sense" because "a subjective, conclusory approach . . . cannot reasonably be assessed for reliability[.]" *United States v. Williams*, No. 3:13-CR-00764-WHO-1, 2017 WL 3498694, at *10 (N.D. Cal. Aug. 15, 2017) (quoting *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014)).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

> *(i)* Dr. Recht's opinion that the tumor and syrinx grew significantly between 2018 and 2022 is not reliable.

The Government seeks to exclude Dr. Recht's opinion that the tumor and syrinx grew significantly between 2018 and 2022 because he fails to define what a "significant" growth is, does not "set forth which symptoms he believes are indicative of tumor growth," or cite literature in support of his opinion. Dkt. No. 25 at 6.

The Court agrees that this opinion should be excluded. Although Dr. Recht states that "[t]he cervical ependymoma was significantly smaller in 2018," Dkt. No. 26-19 at 5, he does not explain why he believes the tumor existed at that time or whether the tumor first appeared prior to 2018. He goes on to opine that "[t]he tumor grew significantly over the years in February 2018 to February 2022," *id.*, but again, he does not explain whether the tumor first appeared in February 2018, nor does he explain why he chose February as a start date for this significant growth period. Dr. Recht seems to assume that the tumor first appeared in 2018, but again, he does not actually identify when he believes the tumor first appeared, and does not address whether Barsness's complaints of increased pain in his wrist area beginning in 2015, Dkt. No. 26-2 at 3, could have indicated the presence of a tumor.

Furthermore, while Dr. Recht avers that "[t]he growth pattern for ependymomas is likely consistent over time," Dkt. No. 26-19 at 5, he does not explain the basis for this opinion or why this general "pattern" is likely to apply in this case. As the Government points out, Dr. Recht conceded during his deposition that "ependymomas have no known growth rate." Dkt. No. 25 at 6; Dkt. No. 26-21 at 6 (testifying that the tumors have no "uniform rate of growth"). Furthermore, without a tumor start date or another basis to conclude that the tumor was "significantly smaller" in 2018, there is no basis to infer the amount of growth between 2018 and 2022. To the extent Dr. Recht's opinions are based on his experience, he does not explain "how that experience leads to

the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 Advisory Committee's notes to 2000 amendment.

Plaintiffs attempt to shore up Dr. Recht's opinion with deposition testimony, Dkt. No. 33 at 11–13, but experts cannot salvage deficient reports "by supplementing them with later deposition testimony." *Ciomber v. Coop. Plus, Inc.*, 527 F.3d 635, 642 (7th Cir. 2008); *see also Avery*, 2024 WL 2959541, at *6. Instead, "[u]nder Rule 26(a), a 'report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial,'" and "[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions." *R.C. Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010) (quoting *Salgado v. Gen. Motors Corp.,* 150 F.3d 735, 741 n.6 (7th Cir. 1998)); *see also Engilis*, 2025 WL 2315898, at *8 (later testimony by an expert was inadmissible because "it was not disclosed in his expert report," and "[t]he federal rules generally forbid the use of any information not properly disclosed") (citation modified).

This opinion is excluded.

> *(ii)* Dr. Recht's opinion on the likelihood of a better surgical outcome in 2018 is not reliable.

Dr. Recht also opines that surgery four years earlier, in 2018, "would have been less difficult" and the tumor would have been "more likely to have been removable without Mr. Barsness experiencing permanent neurologic injury." Dkt. No. 26-19 at 8; *see also id.* at 7 ("[t]he morbidity (paralytic injury during required surgery) would not have occurred if this ependymoma was diagnosed in 2018."). His report provides no supporting details or methodology as to this part of his opinion. When pressed during his deposition, Dr. Recht acknowledged that "there really is no data that says definitively" that tumor size matters in terms of post-surgical outcomes. Dkt. No.

35-36 at 16. Although he does state that "there is enough suggestive evidence" linking tumor size to outcome, *see id.*, he does not cite to or otherwise describe any of that evidence in his report. Indeed, he conceded at his deposition that without knowing what the size and extent of the tumor was in 2018, there is no way to know whether the surgery would have been more or less difficult in 2018, and that he did not know on a more likely than not basis what the outcome of Barsness's surgery would have been in 2018. Dkt. No. 26-21 at 11–12, 18–19.

The parties argue over whether two academic articles that Dr. Recht identified during his deposition support his opinion that "the smaller the tumor, the better the [surgical] outcome." Dkt. No. 33 at 12; Dkt. No. 36 at 5; Dkt. Nos. 37-2, 37-3. But whether the articles substantively support the opinion or not is irrelevant here, because Dr. Recht did not cite or describe the articles in his report and when asked why not, he testified that "they don't specifically pertain to this case" and that he "didn't think [the articles] helped the case one way or the other." Dkt. No. 37-1 at 7–8. Even if Dr. Recht had testified that he relied on these articles to support his opinion, again, experts cannot salvage deficient reports "by supplementing them with later deposition testimony." *Ciomber*, 527 F.3d at 642; *see also Engilis*, 2025 WL 2315898, at *8. To be sure, experts can modify an opinion in response to new considerations, and they can explain information contained in their report during oral testimony, but they cannot reach "initial conclusions prematurely and based on incomplete data" then later gather "additional information . . . to shore up [those] initial opinions." *Haller v. AstraZeneca Pharms. LP*, 598 F. Supp. 2d 1271, 1297 (M.D. Fla. 2009).

Ultimately, the Court finds no discernable methodology behind Dr. Recht's opinion that surgery in 2018 "would have been less difficult" and the tumor "more likely to have been removable" without permanent injury. Dkt. No. 26-19 at 8. To the extent Dr. Recht attempts to bridge the analytical gap by relying on his "wide body of experience," Dkt. No. 26-21 at 17, that too fails. As noted above, he has no surgical experience and does not otherwise explain how his

experience led him to his conclusion. *Engilis*, 2025 WL 2315898, at *10 (expert's "mere talismanic invocation of 'clinical experience'" did not suffice under Rule 702). The Court must therefore exclude this part of his opinion. *See Avery*, 2024 WL 2959541, at *7; *Stepien v. Raimondo*, No. 2:21-CV-01410-LK, 2024 WL 4043589, at *28 & n.21 (W.D. Wash. Sept. 4, 2024); *see also e.g.*, *GPNE Corp. v. Apple, Inc.*, No. 12-CV-02885-LHK, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014) (excluding expert opinion where expert admitted that there was no methodology other than his 30 years of experience); *Williams*, 2017 WL 3498694, at *13 ("Because of the lack of objective criteria, or even notes documenting the admittedly subjective determinations, the defendants would be unable to challenge this evidence in front of a jury.").

### 3. Dr. Vogel's Opinion is Admitted in Part and Excluded in Part

Plaintiffs' second expert, Dr. Vogel, provides a similar opinion: that "if surgery had been performed in 2018, the tumor would have been significantly smaller with less mass effect on the spinal cord and capable of removal without causing permanent neurologic spinal cord injury." Dkt. No. 26-18 at 5. Dr. Vogel is a Professor of Pathology and Director of Neuropathology at Stanford University School of Medicine; he has experience with spinal ependymomas and has published a chapter in a book on the topic. *Id.* at 2–3. However, he does not interact with patients directly, and like Dr. Recht, has no surgical experience. Dkt. No. 26-22 at 3–4.

#### (a) Dr. Vogel's opinion is relevant and he is qualified to opine on spinal tumors

For the same reason that Dr. Recht's opinion clears *Daubert*'s relevance hurdle, Dr. Vogel's opinion does too. Dr. Vogel's education and experience also qualify him to provide an expert opinion on spinal tumors. The Government challenges his ability to opine on surgical outcomes, Dkt. No. 25 at 10, which the Court discusses in more detail below.

*(b) The first part of Dr. Vogel's opinion (on the tumor's detectability in 2018) is reliable, but the rest of the opinion is not*

*(i) Dr. Vogel's opinion about the tumor's presence and detectability in 2018 is reliable.*

Dr. Vogel opines that a cervical spine MRI in 2018 "would have certainly shown the ependymoma allowing for surgical removal four years earlier." Dkt. No. 26-18 at 4. He explains that "[a]n ependymoma, if it is left to grow, causes an increasing mass effect within the cervical spinal cord causing clinically significant neurologic responses as evidenced in the February 12, 2018 Primary Care Initial Note," and then describes the symptoms present during that February 2018 visit. *Id.* ("These symptoms are consistent with a cervical abnormality and an MRI . . . at that time (February 12, 2018) would have certainly shown the ependymoma[.]"). This part of Dr. Vogel's opinion is grounded in an objective methodology and tied to the facts here. It is therefore reliable.

*(ii) Dr. Vogel's opinion that the tumor was "significantly smaller" in 2018 and could have been resected at that time without permanent injury is excluded.*

The same cannot be said for the latter part of the opinion, that "if surgery had been performed 3–4 years earlier in 2018, the tumor would have been significantly smaller, and the resection would have been accomplished without resulting in permanent neurologic injury." Dkt. No. 26-18 at 4. There are two subparts here: that in 2018 (1) the tumor would have been significantly smaller, and (2) surgery would have been accomplished without injury to Barsness. The Court addresses each in turn.

The Government's challenges to Dr. Vogel's opinion that the tumor would have been significantly smaller in 2018 are virtually identical to those aimed at the corresponding part of Dr. Recht's opinion. It argues that "[t]he report does not define 'significantly', does not cite any literature, and does not describe the methodology used to come to his conclusion." Dkt. No. 25 at

9. It also points out that Dr. Vogel "admits that there is no known growth rate for ependymomas" and "does not know how large the tumor was in 2018 and cannot estimate whether the tumor was 2% larger or 50% larger in 2022." *Id.*

Dr. Vogel's report fails to identify any underlying methodology on which he bases his opinion that the tumor would have been significantly smaller in 2018. Dr. Vogel's report describes the symptoms Barsness experienced in 2018, but not much more. Although he appears to assume a "steady growth" rate, Dkt. No. 26-18 at 4, he provides no objective basis on which to evaluate that claim and appears to backtrack during his deposition, as the Government points out, *see* Dkt. No. 25 at 9; Dkt. No. 26-22 at 16 ("I don't know about an objective growth rate in [grade two ependymomas]"); *id.* at 18 ("we don't know [how much smaller the tumor was in 2018] failing the lack of a radiographic study in 2018"); *id.* at 19 (the "way to know whether this tumor would have been millimeters smaller, centimeters smaller" would have been "to have obtained an MRI study in 2018"). And like Dr. Recht, Dr. Vogel does not identify the date when the tumor likely first appeared; without a start date or another basis to conclude that the tumor was "significantly smaller" in 2018, there is no basis to infer the amount of growth between 2018 and 2022. Indeed, Dr. Vogel suggests that the tumor was "left to grow" for some time period before the February 2018 primary care appointment. Dkt. No. 26-18 at 4.

During his deposition, Dr. Vogel appears to base his opinion on the extent of the tumor's growth (and therefore its smaller size in 2018) on the tumor's "KI-67 proliferative index," Dkt. No. 35-35 at 23–24, identified in Barsness's pathology report, Dkt. No. 26-16 at 4, 8. He explains that the KI-67 is estimated to be one to two percent, which implies "indolent growth of the tumor" which "over a four-year period of time . . . would amount to a gradual and significant increase in size." Dkt. No. 35-35 at 23–24. But none of this is in the report, and as noted above, Plaintiffs cannot rely on deposition testimony to supplement a deficient report. *See Avery*, 2024 WL

2959541, at *6; *see also Ciomber*, 527 F.3d at 642 ("[T]he parties' need for expert depositions would increase if they could use deposition testimony to provide information they should have initially included in their Rule 26(a)(2) report."). Parties are "entitled to a *complete* disclosure of all opinions—not a sneak preview of a moving target." *Mariscal v. Graco, Inc.*, 52 F. Supp. 3d 973, 983 (N.D. Cal. 2014).

Dr. Vogel's related opinion that a 2018 surgery could have been accomplished without permanent neurological damage to Barsness faces the same issues. The report does not describe an underlying methodology upon which the opinion is based. Plaintiffs point out that Dr. Vogel testified that a tumor becomes stickier (and thus harder to resect) as it grows. Dkt. No. 33 at 16. But again, subsequent deposition testimony cannot be used to salvage a deficient report, *Ciomber*, 527 F.3d at 642, and even if it could, Dr. Vogel cannot have based his opinion on the tumor's "stickiness" because his initial report pre-dates his review of Dr. Ellenbogen's operative report, Dkt. No. 26-18 at 3, 8, which is where the notion that the tumor was "sticky" comes from, Dkt. No. 26-15 at 4–5. Notably, there is no indication that Dr. Vogel filed a supplemental report based on this new information, as required by Rule 26(e)(1)(A); thus, Plaintiffs cannot use it. *Engilis*, 2025 WL 2315898, at *8. And last, Dr. Vogel is not a surgeon and so cannot rely on his experience to ground his opinion on potential surgical outcomes from an earlier surgery. Dkt. No. 26-22 at 2– 3. General assertions of "common knowledge" also will not do. *See* Dkt. No. 33 at 15. Dr. Vogel's opinion simply assumes that in 2018 the tumor would have been easier to resect without complications, which is the kind of impermissible *ipse dixit* routinely excluded under *Daubert*. *Domingo v. T.K.*, 289 F.3d 600, 607 (9th Cir. 2002) ("Nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (citation modified)); *see also Bell v. Boeing Co.*, No. 20-CV-01716-LK, 2022 WL 1206728, at *8 (W.D. Wash. Apr. 22, 2022) (citing cases).

4. <u>Dr. Kaloostian's Opinion is Admitted</u>

Dr. Kaloostian opines that "in 2018 the ependymoma would have been significantly smaller and surgically removable," and that "the surgery would not have caused permanent neurologic injury to Mr. Barsness." Dkt. No. 26-17 at 9. Just as with the other two opinions, the Government seeks to exclude this one as "speculative and based on no discernible methodology." Dkt. No. 25 at 11.

(a) *Dr. Kaloostian's opinion is relevant and he is qualified to give it*

For the same reasons the other two opinions are relevant, Dr. Kaloostian's opinion is too. The parties appear to agree that Dr. Kaloostian is qualified to provide his opinion.[3] Dr. Kaloostian is a neurological surgeon with an active practice, Dkt. No. 26-17 at 2–3, and has resected several ependymomas over his career, including some that were as large as Barsness's tumor, Dkt. No. 26-23 at 5. The Court finds him to be qualified to offer his opinion.

(b) *Dr. Kaloostian's opinion on the tumor's size in 2018 and growth through 2022 is reliable*

The first part of Dr. Kaloostian's opinion that the tumor would have been "significantly smaller" in 2018 is reliable. Dr. Kaloostian appears to associate the progression of Barsness's symptoms with the tumor's size and growth over time. He first notes that "Mr. Barsness'[s] symptoms in 2018 and following were consistent with cervical spine abnormalities that required [the] specialties including primary care, orthopedics, rehabilitation, physiatry, and neurosurgery to order an MRI with and without contrast." Dkt. No. 26-17 at 7. Dr. Kaloostian describes his review of Barsness's medical reports and specifically details the change in symptoms over time. *See id.* at 4–7 (for example, describing occasional numbness in Barsness's hand but not fingers in

---

[3] The Government characterizes Dr. Kaloostian's clinical experience as "limited" but does not otherwise argue that he is unqualified to opine on the matters stated in the report. *Id.* at 12.

2018, which worsened into "more persistent" and "fairly constant" numbness reaching his thumb and index finger in 2020, which worsened into "entire right arm numbness" and "especially [his] index finger" in 2022). He notes that Barsness's complaints from 2018 onward "did NOT match up with carpal tunnel syndrome, or any wrist related pathology," as acknowledged by Dr. Gelfenbeyn in October 2018, and opines that "Dr. Gelfenbeyn was obligated as a reasonably prudent neurosurgeon to understand that if carpal tunnel syndrome is not the cause of his clinical complaints, that those complaints are cervical in nature[.]" *Id.* at 7, 9. Dr. Kaloostian's deposition testimony also confirms his view that the tumor's growth can be associated with the development of more acute symptoms. *See* Dkt. No. 35-48 at 8 ("I think you can determine change in, in size based on progression of patient symptoms, which we noted in Mr. Barsness's case as well as progression of EMG findings, which we saw in, in his case over time."). Although the report could be more detailed on this point,[4] this is not a situation where the opinion lacks any kind of underlying methodology and cannot be effectively challenged in front of a jury.

### (c) *Dr. Kaloostian's opinion on surgical outcomes is admitted.*

Dr. Kaloostian's opinion that surgery on a smaller tumor in 2018 would not have caused Barsness's permanent neurologic injury is also reliable. He explains in the report that a smaller tumor has "less mass effect into the cervical spinal cord and without a formation of a syrinx in the spinal cord," Dkt. No. 26-17 at 10, which appears to be the principal basis for his conclusion that a smaller tumor would have been removable without injury in 2018. *Id.* at 9; *see also id.* at 8 ("Early diagnosis of a tumor anywhere in the body, but especially the spinal cord, is critical in order to identify the tumor at a smaller size with as little growth and mass effect into/on the spinal

---

[4] For example, Plaintiffs note that Dr. Kaloostian testified about Dr. Ellenbogen's description of the tumor as "bulged out" in his operative note and how this may relate to the progression of Barsness's symptoms, *id.* at 11–12 (testimony), but the report makes no mention of this.

1  cord as possible.").[5] In other words, because Barsness's tumor would have been "significantly

2  smaller" with less mass effect into the spinal cord and would have lacked the formation of a syrinx

3  in the spinal cord in 2018, the tumor would have been surgically removable without injury at that

4  time; the injury "was a direct cause of the size of the tumor that Dr. Ellenbogen was required to

5  remove in March 2022." Dkt. No. 26-17 at 9–10. Although Dr. Kaloostian conceded in his

6  deposition that his opinion is "not based on any literature or other concrete scientific evidence,"

7  but just his "own experience and knowledge," *id.* at 16, the Court finds that his surgical training

8  and experience combined with his statements about the tumor's mass effect is a sufficient basis to

9  opine on possible outcomes from an earlier surgery here.

10       The Government further argues that Dr. Kaloostian "does not explain how he excluded

11  other possible causes or risk factors for poor neurological outcome and has not undertaken a

12  differential diagnosis." Dkt. No. 36 at 9. However, an expert need not "eliminate all other possible

13  causes of a [medical] condition for the expert's testimony to be reliable," instead, it is enough that

14  the proposed cause is "a substantial causative factor." *Wendell*, 858 F.3d at 1237. The Court finds

15  that Dr. Kaloostian has done enough to meet this bar. To the extent there are alternative risk factors

16  that Dr. Kaloostian did not consider, his opinions can be challenged on cross-examination and by

17  presenting contrary expert testimony.

18  **C.     The Government's Motion for Summary Judgment is Denied**

19       1.  <u>Legal Standard</u>

20       Summary judgment is appropriate only when "the movant shows that there is no genuine

21  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

22

23  ───────────────
    [5] He elaborated on this in his deposition: "the bigger a tumor is and the more pressure it's put on the surrounding
24  spinal cord, there is a higher risk as compared to a small tumor, which is not putting pressure or as much pressure on
    the surrounding tissue and a more invasive tumor would have a higher spinal cord injury rate than a less invasive
    tumor." Dkt. No. 35-48 at 14–15.

1    Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

2    stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In essence, the inquiry is

3    "whether the evidence presents a sufficient disagreement to require submission to a jury or whether

4    it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent

5    that the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense

6    that, where the facts specifically averred by that party contradict facts specifically averred by the

7    movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

8           To establish that a fact cannot be genuinely disputed, the movant can either cite the record

9    or show "that the materials cited do not establish the . . . presence of a genuine dispute, or that an

10   adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).

11   Once the movant has made that showing, "the nonmoving party must come forward with specific

12   facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

13   *Radio Corp.*, 475 U.S. 574, 587 (1986) (citation modified). Metaphysical doubt is insufficient, *id.*

14   at 586, as are conclusory, non-specific allegations, *Lujan*, 497 U.S. at 888–89. Nor is it the Court's

15   job to "scour the record in search of a genuine issue of triable fact"; rather, the nonmoving party

16   must "identify with reasonable particularity the evidence that precludes summary judgment."

17   *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55

18   F.3d 247, 251 (7th Cir. 1995)). The Court will enter summary judgment "against a party who fails

19   to make a showing sufficient to establish the existence of an element essential to that party's case,

20   and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S.

21   317, 322 (1986).

22         2.  <u>The Government's Motion for Summary Judgment is Denied</u>

23          The Government argues that, without causation expert testimony from Drs. Recht, Vogel,

24   and Kaloostian, it is entitled to summary judgment. Dkt. No. 27 at 1–2. For the reasons explained

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EXPERT TESTIMONY AND
DENYING MOTION FOR SUMMARY JUDGMENT - 21

below, the motion is denied.

Plaintiffs' FTCA suit is governed by Washington law. *See Yako v. United States*, 891 F.2d 738, 745 (9th Cir. 1989) (substantive law of the place where the act or omission complained of occurred applies). As discussed above, Plaintiffs bring two claims: a claim for medical negligence and a claim for failure to obtain informed consent. Dkt. No. 7 at 6–8. Although the Government moves for summary judgment (as opposed to partial summary judgment), its motion addresses only the medical negligence claim.[6] A non-moving party must receive adequate notice and an opportunity to respond to the moving party's arguments before summary judgment can properly be entered against it. *See Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan,* 662 F.2d 641, 645 (9th Cir. 1981); *see also Rodman v. Safeway Inc.*, No. 11-CV-03003-JST, 2015 WL 660214, at *1 (N.D. Cal. Feb. 12, 2015) ("As the party moving for summary judgment, Plaintiff was required to frame the relief sought by his motion clearly, in order to provide adequate notice to the opposing party and to the Court."). Because the Government's motion does not provide such notice to Plaintiffs with respect to the informed consent claim, the Court does not entertain summary judgment on that claim.[7]

To defeat summary judgment on their medical negligence claim, Plaintiffs must establish a genuine issue of material fact on two key elements: "(1) that the defendant health care provider failed to exercise the standard of care of a reasonably prudent health care provider in that same

---

[6] Although medical negligence and informed consent claims are related, they are standalone claims with different requirements and theories of recovery. *See Davies v. MultiCare Health Sys.*, 510 P.3d 346, 352 (Wash. 2022) (en banc).

[7] Even if the Court construed the motion to seek summary judgment on this claim, it would still deny the motion. Plaintiffs' causation theory as applied to the informed consent claim is largely the same as in the medical negligence context. They allege that by failing to timely inform Barsness that his "physical complaints could be due to cervical abnormalities" for which an "MRI would be best diagnostic tool to diagnose" and failing to explain associated risks with failing to timely remove a tumor, Barsness could not provide informed consent as to the treatment he received over the relevant time period, which led to delayed diagnosis and surgery that caused him permanent injury. Dkt. No. 7 at 7–9. As explained below, Plaintiffs' expert testimony creates a genuine issue of material fact as to causation in the medical negligence context, and it does so for the same reasons in the informed consent context.

ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE EXPERT TESTIMONY AND DENYING MOTION FOR SUMMARY JUDGMENT - 22

profession and (2) that such failure was a proximate cause of the plaintiff's injuries." *Frausto v. Yakima HMA, LLC*, 393 P.3d 776, 779 (Wash. 2017) (citing Wash. Rev. Code. § 7.70.040). The Government argues that if the Court excludes the expert causation testimony of Drs. Recht, Vogel, and Kaloostian, then no genuine issue of material fact remains for trial on the second element: proximate causation. Dkt. No. 27 at 2, 10.[8]

Under Washington law, "[i]f a plaintiff lacks competent expert testimony to create a genuine issue of material fact with regard to one of the elements of the [medical negligence] claim and is unable to rely on an exception to the expert witness testimony requirement, a defendant is entitled to summary judgment." *Reyes v. Yakima Health Dist.*, 419 P.3d 819, 823 (Wash. 2018) (en banc). Here, Plaintiffs have proffered competent expert testimony on the issue of causation, and the admissible portions of the expert testimony and reasonable inferences from it could allow a reasonable jury to find in Plaintiffs' favor on causation. For example, Plaintiffs have offered admissible expert testimony that:

- If a cervical spine MRI had been performed in 2018, the tumor would have been detected, *see* Dkt. No. 26-18 at 4 (Dr. Vogel); Dkt. No. 26-17 at 9–10 (Dr. Kaloostian);

- If the tumor had been detected in 2018, the treatment would have been surgical removal, *see* Dkt. No. 26-17 at 9 (Dr. Kaloostian);

- The tumor grew between 2018 and 2022, and thus would have been smaller in 2018, *see id.* at 7–10 (Dr. Kaloostian); and

- The tumor's growth between 2018 and 2022 made it more difficult to resect without complications, and thus an earlier surgery of a smaller tumor in 2018 would have likely been achieved without permanent injury to Barsness, *see id.* at 7–10 (Dr. Kaloostian).

Because the Court finds a genuine issue of material fact as to causation based on the admissible portions of Plaintiffs' proffered expert testimony, it need not address Plaintiffs'

---

[8] Although some of Plaintiffs' briefing addresses the first element, the standard of care, Dkt. No. 34 at 2–7, the Government has clarified that it is not moving for summary judgment on this basis, Dkt. No. 38 at 2.

alternative argument that even without the expert testimony, "the evidence and inferences remaining in the record (including the testimony of the United States' experts) will be sufficient to meet Plaintiffs' burden of showing that the four-year delay in diagnosing and treating [Barsness]'s ependymoma caused his injury." Dkt. No. 34 at 18; *see also Reyes*, 419 P.3d at 823 (noting that there are some exceptions to general requirement that causation must be proved by expert testimony).

## III.   CONCLUSION

For the reasons described above, the Government's Motion to Exclude Testimony is GRANTED IN PART AND DENIED IN PART, Dkt. No. 25, and its Motion for Summary Judgment is DENIED, Dkt. No. 27. Within 30 days of this Order, the parties are directed to meet and confer and submit a proposed schedule for trial and the remaining pretrial deadlines that complies with the Court's template scheduling order. Dkt. No. 31-1 at 2.

Dated this 14th day of August, 2025.

Lauren King
United States District Judge